IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2020

**SINAN GIDER V. LYDIA HUBBELL**

**Appeal from the Juvenile Court for Davidson County
Nos. 2008-5426; PT241040        Sheila Calloway, Judge**

_____

**No. M2018-01941-COA-R3-JV**

_____

The mother of an eight-year-old child petitioned to have the primary residential parent designation changed from the father to herself. The juvenile court found she failed to show that a material change of circumstance warranted such a change, and she appealed. We affirm the juvenile court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and CARMA DENNIS MCGEE, J., joined.

Lydia Ann Hubbell, Antioch, Tennessee, pro se.

Sinan Gider, Nashville, Tennessee, pro se.[1]

**OPINION**

I. FACTUAL AND PROCEDURAL BACKGROUND

Lydia Ann Hubbell ("Mother") and Sinan Gider ("Father") are the parents of a child born in 2008 ("Child"). Mother and Father did not marry, but they entered into a parenting agreement early in Child's life in which Mother was the primary residential parent and Father had residential parenting time for about half the year. When Child was five years old, Father filed a petition in juvenile court seeking to change the primary residential parent from Mother to himself and deny Mother's request to homeschool Child. Mother appealed the juvenile court's 2015 decision granting Father's petition, and the opinion from that appeal can be found at *Gider v. Hubbell*, No. M2016-00032-COA-R3-JV, 2017 WL 1178260 (Tenn. Ct. App. Mar. 29, 2017). While the earlier appeal was pending, Father

_____

[1]Mr. Gider did not file an appellate brief or participate in this appeal in any way.

filed a petition in 2016 seeking to limit Mother's residential time with Child. Mother sought to be named Child's primary residential parent during these later proceedings. The case at bar addresses Mother's appeal of the juvenile court's 2018 decision regarding Child's primary residential parent and the parties' residential parenting time.

Proceedings in Earlier Case

In May 2014, Father filed a petition in juvenile court to establish a parenting plan and deny Mother's request to homeschool Child. *Gider*, 2017 WL 1178260, at *1. Father alleged that a material change of circumstances had occurred based on Mother's unstable mental health, problems with her physical health, and the condition of her home. Father sought to be named the primary residential parent with Mother to have limited parenting time. *Id.* Father non-suited his original petition and filed another petition on February 24, 2015. While the case was pending, the trial court ordered the Tennessee Department of Children's Services ("DCS") to evaluate Mother's home. The evaluators found the home to be "inappropriate for raising a child." *Id.* at *2. At trial, Mother stipulated to the following:

> My house is a mess. I've been on disability for twelve or thirteen years. I currently have physical health issues . . . . I have had [] very serious mental health issues with depression . . . . I'm stable now . . . [but] I will agree, I have a history of mental health issues: anxiety, depression, that sort of thing.

*Id.* Prior to the trial in 2015, Mother was charged with stalking Father, and the circuit court granted Father an order of protection that prohibited Mother from having contact with Father or Child for one year. *Id.* Mother conceded at trial that she had shared details of the custody case with Child. When asked whether she believed the litigation and "topics of a sensitive nature" were appropriate to discuss with Child, Mother responded, "I do." Mother did not believe a child can be too young to discuss most things. *Id.* at *3.

The juvenile court granted Father's petition in an order entered on October 15, 2015. It designated Father as the primary residential parent and granted him sole decision-making authority. *Id.* at *5. The court imposed the following restrictions on Mother's visitation:

> (1) subjecting Mother's parenting time to the terms of the order of protection;
> (2) requiring, initially, therapeutic visitation with a "certified moderator"; and (3) conditioning unsupervised visits on Mother completing two months of therapeutic visits and a determination by the agency conducting the therapeutic visits that Mother was ready for unsupervised visits. Once unsupervised visits commenced, the order provided that the visits could not be overnight until the condition of Mother's home was significantly improved.

*Id.* In addition, the court enjoined Mother from (1) referencing Father in her posts on social media; (2) speaking about Father in a disparaging way to Child or to others while in Child's presence; and (3) discussing the custody proceedings or "adult-only issues" with Child. *Id.*

Mother appealed the trial court's October 15, 2015 order. We affirmed the trial court's judgment naming Father the primary residential parent and sole decision-maker. *Id.* at *12. In addition, we determined that "[t]he record and the juvenile court's findings support the conclusion that Mother's unrestricted visitation would cause harm to the child and that the limitations ordered by the court are the least restrictive visitation plan available and practical." *Id.* at *9. We concluded that the limitations the juvenile court placed on Mother's visitation were "the least restrictive option" for the following reasons:

> First, ordering supervised visitation was necessary because the order of protection entered against Mother, which was still in place at the time the juvenile court's order was entered, prevented her from having contact with the child. Supervised visitation was also appropriate, at least for a time, due to Mother's apparent mental instability and her practice of discussing the custody dispute and other sensitive topics with the child. Finally, placing limitations on the amount of time the child spent in Mother's home was also necessary until Mother could demonstrate that she improved the home's condition. We further note that these limitations on Mother's visitation were not permanent. After two months of therapeutic, supervised visits, Mother would be permitted to exercise unsupervised visitation, which could become overnight visits when she improved the condition of her home.

*Id.* at *10. We modified the restrictions on Mother's communications to comport with the law on prior restraints,[2] *id.* at *9-12, but we concluded that it was "entirely proper for the juvenile court to restrict Mother from making disparaging and clearly defamatory remarks about Father online or to the child or in the presence of the child," *id.* at *12.

## Case on Appeal

A little over a year after the juvenile court issued its order granting Father's petition to be designated Child's primary residential parent with sole decision-making authority, while Mother's appeal of the judgment was pending, Father filed a petition to modify Mother's visitation on October 17, 2016. According to Father's petition, Mother began supervised visitation with Child following the expiration of the order of protection in June 2016, and Child showed "a drastic change in behavior" once those visits began. Father asserted numerous material changes in circumstance that he claimed warranted a

---

[2]Our modification included removing from the injunction "prohibitions against 1) any reference by Mother to 'Father at all on social media' or 2) discussions of 'adult-only issues' beyond those topics specifically referenced in the injunction." *Id.* at *12.

modification of the juvenile court's October 2015 order granting Mother visitation rights with Child, including the following: (1) Child's severe psychological and emotional decline; (2) Mother's discussion with Child of Mother's negative view of public school and the benefits of homeschooling; (3) Mother's discussion on social media of her plans to abscond with Child from Child's childcare facility; (4) Mother's visitation with Child in violation of the restraining order; (5) Mother's interference with Father's relationship with Child by portraying Father to Child in a negative light; (6) Mother's discussion with Child of court proceedings involving Child; (7) Mother's violation of the order of protection by encouraging third parties to communicate with and harass Father on Mother's behalf; and (8) an extension of the order of protection against Mother for an additional year as it related to Father. Father requested the court to grant him the following relief: (1) require Mother to undergo a parenting assessment with a mental health component; (2) refer this matter to family support services; (3) require Mother to comply with any conditions or actions recommended by family support services; (4) terminate Mother's visitation with Child until Mother demonstrates a material change of circumstance warranting the renewal of her visitation; (5) enjoin Mother from posting sensitive details of Child's life on social media; and (6) rule that it is not in Child's best interest to award Mother the rights set forth in Tenn. Code Ann. § 36-6-101(a)(3)(B) in the event Mother petitions to be awarded those rights. On November 16, 2016, Mother filed a petition seeking a modification of the parenting schedule and requesting Father to be held in contempt because he would not permit Mother to visit with Child. Mother also sought to be designated the primary residential parent.

The juvenile court held a hearing on February 10 and 15, 2017, to consider some pre-trial issues, including whether Child (who was then eight years old) should be subject to a subpoena by Mother to testify and whether Mother was ready for unsupervised visitation with Child. The court made the following findings of fact in an order entered on March 14, 2017:

> 1. The Mother was previously ordered [to have] supervised visits by this court on October 14, 2015. The mother was required to have at least two (2) months of supervised visits. The mother would be allowed unsupervised visits once the agency supervising the visitations indicated an opinion that the Mother was ready for unsupervised visits.
>
> 2. Although there was some confusion with the Mother's interpretation of the order, the court clarified at a previous hearing that the unsupervised visits were not to automatically begin after Mother had completed two (2) months of supervised visits. Rather, it had been the court's intention that the agency supervising visitation would have to specifically indicate that Mother was ready for unsupervised visits.

3. According to Ms. Stevenson from Camelot, the visitation with the Mother and the child has not gone well. During several visits, the Mother has brought up inappropriate conversations with the child, became abrasive during one particular visit, attempted to leave the visitation area during another visit, as well as not abiding by rules of the visitation.

4. Because of the complications caused by the Mother during the latest visits, Camelot is no longer willing to provide the supervised visits nor do they think the Mother has demonstrated a readiness to transition to unsupervised visits.

5. Furthermore, according to both Dr. Berryman and Kaci Cart, the child is having extreme behavior issues. Her behaviors include having tantrums, kicking and hitting other students. Her school behavior has not improved and she's made minimal progress in counseling.

6. According to Dr. Berryman, the visits with the mother have not gone well. The child particularly talks about the time when the "lady called the cops for no reason" and another time when the visit was stopped early. Furthermore, Ms. Stevenson testified that the child takes on the role of trying to protect her mother when they are together. Neither the counselor, the psychiatrist nor the visitation supervisor believes the visits have been improving the child's emotional state or behaviors.

The juvenile court granted Father's motion to quash Mother's subpoena for Child to testify at the trial. As to Mother's visitation with Child, the court ordered these visits to remain supervised. The court wrote:

[I]t is clear that the mother's behavior during the visits has been disruptive. There has been no improvement with her attitude when it comes to the visitation. Clearly, her behavior around the child during the supervised visits has only made the child's emotional state more fragile. Furthermore, three different professionals working with the child have each determined that the Mother's behavior has been inappropriate. It is also clear that the Mother will not follow court orders if she disagrees with the content of the order. Therefore, this court denies the Mother's request to have unsupervised visits.

In an order entered on October 9, 2017, the circuit court issued a restraining order against Mother enjoining her from coming within five hundred feet of Child's elementary school; within five hundred feet of any place where she knows or has reason to believe Child is present; and within five hundred feet of Father's home. The court further enjoined Mother from writing or posting Child's name in public places and from posting or displaying signs or posters containing Child's name in public places. The basis for this restraining order included testimony that the court summarized as follows:

The Court first heard testimony from Elizabeth Goetz, the Assistant Principal at the Minor Child's school. Ms. Goetz testified that on the first day of school Ms. Hubbell appeared at the school with signs which said "Free [Child]" and displayed these signs while hundreds of parents and students were walking in to the building. Ms. Goetz testified that it has been a disturbance to have Ms. Hubbell show up at the school with signs. Ms. Goetz further testified that several students have come to the office with rocks and bracelets which they found on the playground which said "Free [Child]." Ms. Goetz testified that on September 11, 2017, the school had to contact mobile crisis services because [Child] expressed a desire to kill herself. On cross examination by Counsel for Mother, Ms. Goetz did acknowledge that the Minor Child has had extreme outbursts in the past when Ms. Hubbell was not present. Ms. Goetz, also testified that she was aware that the Minor Child had previously expressed she wished to see her mother, but stated that the Child had not done so during this school year.

The Court next heard testimony from the Mother, Lydia Hubbell. Mother testified that on Minor Child's first day of school Mother appeared at the school with a sign that said "Children Need Both Parents" and "Free [Child]."

Mother testified that she is aware of the Temporary Restraining Order currently in place with the Court and has been served with this Order. Mother admitted that she has a Facebook page under the name Lydia Hubbell. She testified that there was a post on August 18, 2017, in which she acknowledged she was aware of the Restraining Order. She further stated she understood that the intention was to keep her from being within 500 feet of [Child]. Mother admitted to posting a Facebook page under Lydia A. Hubbell on September 18, 2017, in which she expressed plans to go to high-traffic areas to pass out literature and signs bearing Minor Child's name after she was served with a copy of the Restraining Order enjoining her from doing so. She testified that she has made yard signs with Minor Child's name on them and encouraged people to put these signs in their yards.

Mother admitted that since being served with the Restraining Order she has been within 500 feet of the school. She testified that she has created stones similar to those found by the students at Minor Child's school, with statements such as "Free [Child]." She stated that she placed these stones on the sidewalk near the school and admitted to throwing some of these stones over the fence of the playground to the school. Mother also admitted that she had written about Minor Child's story on the sidewalk near the school. Mother further testified that she had placed signs in the yard of Mother's "friend" near the school, one of which read "Bring [Child] Home."

Mother admitted to approaching parents and children in the community who she believed may know [Child] to tell her story. She further admitted to giving these persons bracelets with Minor Child's name on them. She admitted to expressing her intent to go to a football game when several hundred people were sitting in the sun to pass out fans with [Child's] face on them. Mother admitted that she had posted on Facebook that she has come nowhere near exhausting all of her efforts to see Minor Child and that she has many other ideas which she may try depending on how desperate she becomes.

When asked by Counsel for Mother, Mother stated that she does not believe her actions have harmed the Minor Child.

. . . .

The Court finally heard testimony by the Father, Sinan Gider. Father testified that on two occasions the Minor Child had seen Mother's chalking and that the chalking made the Child confused and upset. The first instance occurred while the Child was at camp. The second instance occurred at the field where the Child plays soccer on a day when Mother's daughter, Minor Child's half-sister, took the Child to the soccer field. Father also testified that he has seen chalked messages on several occasions. Father testified that on September 9, 2017, there were chalked messages at the West End location where Father was to exchange the Minor Child with the Minor Child's half-sister, Mother's oldest daughter, for the half-sister's visitation time with Minor Child.

Father further testified that due to knowledge of Mother's presence with signs on the first day of school, he waited to take the Child to school, causing the Minor Child to be two (2) hours late for her first day of school. Father also testified that he cannot permit Minor Child to ride the bus because Mother has appeared outside of the bus route.

Father testified that Mother has engaged in stalking behavior of the Minor Child.

The circuit court then transferred the restraining order and order of protection to the juvenile court, where other related matters involving Child and the parties were pending.

Mother moved to modify the restraining order on November 9, 2017, to allow her to have visitation with Child, supervised or not. The juvenile court entered a decree allowing Mother to have supervised visitation with Child pending the final hearing of the case. Following a hearing on February 9, 2018, the court entered an order requiring both

parties to complete an intake form with Youth Villages Intercept, an integrated and intensive in-home parenting skills program that also provides services to children experiencing emotional or behavioral challenges. The court granted Mother phone visitation with Child for up to thirty minutes twice a week. The court stated that Mother would not be granted unsupervised visitation with Child unless or until "an appropriate person, to be determined by the Court, shall inspect the Mother's residence."

On March 12, 2018, Father filed a notice of Child's declining behavior at school that he asserted began after Mother's supervised visitation with Child was reinstated. The behavior at issue included Child's twice telling a teacher "I'm going to kill you" and making a drawing accompanied by the words "I just wanna die so please kill me." The juvenile court thereafter placed a referral with DCS in which the court indicated its safety concerns for Child and stated the need for (1) a referral to Youth Villages, (2) a home study of Mother's residence, (3) intensive in-home services to assist Child and family in home and school settings, and (4) observations and supervision by Progressive Families. On April 18, 2018, Father filed a notice indicating that Mother had refused to allow a home-study or inspection of her residence, as ordered by the court, and she had refused to accept in-home services from Youth Villages.

The juvenile court held evidentiary hearings over the course of seven days in May and October 2017 and February and March 2018, and it issued its Final Order on April 19, 2018. The court's findings of fact included the following, in pertinent part:

15. The Mother began her supervised visitation after the expiration of the Order of Protection around August of 2016.

16. According to some of the visitation supervisors from Camelot, the visitation with the Mother and the child did not always go well. During several visits, the Mother brought up inappropriate conversations with the child, became abrasive during one particular visit, attempted to leave the visitation area during another visit, as well as not abiding by rules of the visitation. On one occasion, the police were called by the supervisor based on Mother's behavior.

17. Although Judy Mullins testified that she did not have many difficulties with the Mother during her visits, Camelot as an agency was not successful in supervising visits of Mother. Because of the complications caused by the Mother during the latest visits, Camelot was no longer willing to provide the supervised visits nor did they think the Mother demonstrated a readiness to transition to unsupervised visits.

18. Since Mother began her visits, the child began having extreme behavior

issues. Furthermore, according to both Dr. Berryman and several of her counselors and teachers from school, the child is having extreme behavior issues. Her behaviors include having tantrums, kicking and hitting other students. Her school behavior has not improved and she has made minimal progress in counseling.

19. According to Dr. Berryman, the visits with the mother have not gone well. The child particularly talks about the time when the "lady called the cops for no reason" and another time when the visit was stopped early. Furthermore, there was testimony that the child takes on the role of trying to protect her mother when they are together. [Neither] [t]he counselor, the psychiatrist nor the visitation supervisor from Camelot believed that the visits had been improving the child's emotional state or behaviors.

20. Despite the court order requiring Mother to have supervised visits, there were several occasions when Mother went to the child's school to have lunch with her child.

21. Due to Mother's behavior, the Third Circuit Court for Davidson County, Tennessee at Nashville extended the previously granted Order of Protection against Mother on behalf of the Father. Mother's behaviors included throwing decorated rocks saying "Free [Child]" in the child's playground at school and holding up signs on the first day of school referring to [Child].

22. Beginning in December of 2017, Mother has had supervised visits with Latarra Ballard with Progressive Families. According to Ms. Ballard, Mother has been cooperative with supervised visitation and has been appropriate. Although she believes Mother is capable of having unsupervised visits, she believes it would be necessary for the visits to be in conjunction with in-home services. Based on the child's extreme behavior issues, Ms. Ballard recommends that the unsupervised visits happen only when the in-home services are in place.

The court then addressed Mother's request to change the primary residential parent from Father to herself. The court denied this request, stating:

This Court finds that there has been no material change in circumstances that would warrant a change in Primary Residential Parent in this matter since the Court Order from October of 2015. It is clear that the same issues that led to Father being named as the Primary Residential Parent in 2015 still exist today. Although the child's behaviors have increasingly become worse over the years, there still has not been a showing of a material change of circumstances. The Mother's actions continue as they did prior to

- 9 -

the previous court order. Therefore, these factors do not constitute a material change in circumstances, and thus Father must remain Primary Residential Parent.

In order to modify a parenting plan, the court must first determine if there is a material change of circumstance affecting the child's best interest. . . . Again, in this case, there has been no material change of circumstances for purposes of modification of a parenting plan. In this case, the exact same issues that existed prior to 2014 are the same issues currently. There has been no additional proof that anything has changed or that the needs of the child have changed. This child has significant behavior issues; however, [Child] has been struggling with these issues since before 2014.

Having found no material change of circumstances, the Court finds the previous custody order will remain in place. However, in the previous order, Mother would be allowed to exercise unsupervised visitation once an agency recommends it. In this case, Ms. Ballard with Progressive Families has determined that it would be appropriate for Mother to have unsupervised visits as long as there are in-home services in place.

Therefore, the Court will allow unsupervised visits on a gradual basis. Beginning May 1, 2018, the Mother may have unsupervised visits on Sunday mornings from 10:00 a.m.-1:00 p.m. The Mother must inform the Father and the GAL of where she will exercise her visits. The Mother is enjoined from taking the child to her home until in-home services have been put in place. Furthermore, the Mother is enjoined from changing the location of the visits once she has notified Father and GAL of the location. Mother will still continue with supervised visits with Ms. Ballard. Mother will also comply with in-home services, including allowing the visitation monitors and the GAL access into her home.

Shortly after the entry of this order, on April 30, 2018, DCS filed an emergency petition to adjudicate the dependency/neglect of Child and for a restraining order against Mother based on the following referral:

At the beginning of February 2018, [Father] and [Mother] went to court leading [Mother] to get the ability to contact [Child] on the phone. [Father] has been monitoring the phone calls between [Child] and [Mother]. About two weeks ago, [Mother] and [Child] had their first phone call. During one of the phone calls, [Mother] made leading statements to [Child] with [Mother] stating things such as "you miss me and know you want to kill yourself because you cannot see me." It was found [Mother] made the leading comments to [Child] because [Mother] recorded the phone call

- 10 -

between her and [Child] and posted it on Facebook. [Mother] has deleted the post of the phone call and the comments off of Facebook. Since the call between [Child] and [Mother] took place, [Child] has been making statements at school stating [Child] wants to kill [Child's self]. [Child]'s behaviors have also gotten worse at home. [Child] has been having tantrums and has been harming [Child's] dog by kicking it. When [Child] gets upset, [Child] will threaten to kill [Child's self]. It is unknown if [Child] has an active plan to commit suicide. It is believed [Father] has not put a safety plan in place at this time in the event [Child] did follow through with [Child's] suicidal comments. The principal of Gower Elementary School, Ms. Frazier, is aware of what has been going on between [Child] and [Mother]. There is a concern due to the fact the [Child]'s suicidal comments did not start until after the first phone conversation with [Mother]. [Mother] has been spoken to about the first phone call between her and [Child]. Since [Mother] has been spoken to, [Mother] has not been making the same comments on the phone with [Child], but [Child]'s behavior of making comments of suicide and harming [Child's] pet dog has continued.

DCS stated in its petition that one of its employees scheduled a home visit with Mother on April 9, 2018, but that Mother canceled the visit one hour before the visit was to occur. The employee attempted to reschedule the visit on numerous occasions and to include Youth Villages, but Mother "has refused all services." DCS stated it had "concerns with the mother's mental stability due to her erratic behavior," noting Mother's failure to complete any of the steps the court ordered before Mother can have unsupervised contact with Child. DCS further stated that it was concerned Child "would be at risk of harm if allowed to have unsupervised visitation with the mother." DCS requested that the court enter an order (1) restraining Mother from having unsupervised contact with Child, (2) requiring Mother to have "only therapeutic supervised contact" with Child, and (3) ordering Mother to comply with service providers to address the issues in the case.

The juvenile court issued an ex parte restraining order on April 30, 2018, ordering Father not to allow Mother to have any unsupervised contact with Child and enjoining Mother from having any contact with Child "other than therapeutic, supervised contact." Then, on May 8, the juvenile court ordered Mother to cooperate with DCS and allow DCS and Youth Villages to enter her house. In the meantime, the court allowed Mother to have phone calls with Child that were not on speakerphone so long as Mother recorded the phone calls and forwarded them to the guardian ad litem assigned to protect Child's interests.

Mother filed a motion to alter or amend the juvenile court's order issued on April 19, 2018, which the court denied. Father moved on June 19, 2018, to terminate Mother's phone calls with Child based on the following statements Mother made to Child during the calls: "Nobody cares about you except me"; "They are hurting you"; "You cannot see me because you are not free"; and "We need to go back to the old schedule, where you saw

me every day." Father stated in his petition that Child's phone calls with Mother were disturbing Child and that Child had two out-of-school suspensions that occurred after Child began having phone calls with Mother. Father asked the court to stop Mother's phone calls with Child and restrain Mother from contacting Child by phone or any other means of electronic communication. The following month, on July 16, 2018, Father moved to terminate Mother's supervised visits with Child. Father stated that during Mother's supervised visit with Child two days earlier, Mother had given Child a fan with Child's picture on it that contained the text: "Bring [Child] Home." Father also stated that Mother made a post on social media that included a note Child had written during a visit with Mother in which Child said Child wanted "to see mom half the week and dad half the week with overnights." Father asked the court to order Mother to undergo a parenting assessment with a mental health component and to terminate Mother's supervised visits until Mother demonstrated a change in circumstances had occurred to warrant reinstituting supervised visitation.

Following a hearing on August 17, the juvenile court entered an order on September 10, 2018, in which it made the following findings of fact:

1. The Mother continues to refuse the Department, Guardian ad litem, and Youth Villages access to her home. Additionally, she has brought a fan with [Child's] photo and "free [Child]" to a visit with the child, where [Child] was able to see it.

2. Furthermore, the Mother has had the child writing notes during visits which she has then been posting on social media. . . . The Mother has also sent highly inappropriate letters to [Child], with one referencing the ongoing court case and the other solely discussing the death of different animals.

3. The Mother continues to discuss the child's return home with the child in both phone calls and during her visits, although she has been specifically told not to discuss the ongoing court case. The Mother goes so far as to suggest what [Child] needs to do if [Child] wants to see [Child's] Mom more or live with [Child's] Mom. The Mother made it clear in her testimony that she is not going to let the Court have discretion over her conversation topics.

4. The Court had the belief that things were getting better with the Mother, but was sadly mistaken. The Court previously heard testimony on this case in Spring, 2018. The Mother continues to violate rudimentary things the Court has said [are] inappropriate.

5. The Court does not feel it needs additional expert testimony to ascertain what should happen if there are visits. Dr. Berryman was very specific

previously about what needed to occur if there are visits, and the Mother continues to try to wiggle-out of court orders.

6. It is clear to the Court that the Mother is not going to follow-through with the Court's orders and the recommendations of Dr. Berryman and others who have previously testified before the Court.

The court ordered that all contact between Child and Mother be suspended, including "contact through phones, rocks, calls, school visits, appointments, visits, letters, and any other mechanism which would allow contact." The court restrained Mother from having any contact with Child's school and/or receiving any of Child's school documents or paperwork. The court ordered Mother to complete a full psychological exam and a full functioning parenting assessment before the court would consider reinstituting visitation. Finally, the court stated that "Mother can choose not to allow a home visit, but the child will continue to not be allowed to visit at home. DCS, the Guardian ad litem, Youth Villages, and any other provider agencies will need to be allowed to visit the home prior to visits at Mother's home."

Mother appeals the trial court's final order entered on April 19, 2018. She contends the juvenile court erred in (1) failing to find a material change of circumstances had occurred, making it in Child's best interest to change Child's primary residential parent and decision-making from Father to her and (2) not complying with the statutory requirement to maximize Mother's parenting time and unlawfully infringing on her constitutional rights.

## II. ANALYSIS

### A. Standard of Review

Our review of a trial court's findings of fact is de novo on the record, with a presumption of correctness unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013)). Trial courts have "broad discretion in formulating parenting plans" because of their ability to observe the witnesses and assess their credibility. *C.W.H.*, 538 S.W.3d at 495 (citing *Armbrister*, 414 S.W.3d at 693); *see also Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996) ("Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility . . . ."). As a result, we employ a "*limited* scope of review" of a trial court's factual findings in cases involving child custody and parenting plans. *C.W.H.*, 538 S.W.3d at 495 (citing *Armbrister*, 414 S.W.3d at 692-93).

Appellate courts review a trial court's parenting plan for an abuse of discretion and "should not overturn a trial court's decision merely because reasonable minds could reach

a different conclusion." *Id.* (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011); *see also C.W.H.*, 538 S.W.3d at 495. "This standard does not permit an appellate court to substitute its judgment for that of the trial court, but 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Gonsewski*, 350 S.W.3d at 105 (quoting *Henderson v. SAIA, Inc.,* 318 S.W.3d 328, 335 (Tenn. 2010)). "'Appellate courts should reverse custody decisions 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence.'" *C.W.H.*, 538 S.W.3d at 495 (quoting *Kelly v. Kelly*, 445 S.W.3d 685, 696 (Tenn. 2014)). We review a trial court's conclusions of law de novo, with no presumption of correctness. *Armbrister*, 414 S.W.3d at 692.

## B.  Change of Primary Residential Parent Designation

When a petitioner seeks to change the primary residential parent, he or she must initially prove by a preponderance of the evidence that there has been a "material change of circumstance." Tenn. Code Ann. § 36-6-101(a)(2)(B); *C.W.H.*, 538 S.W.3d at 496. "A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B)*.*  If the petitioner makes this showing, the trial court then conducts a best interest analysis by applying the factors set out in Tenn. Code Ann. 36-6-106(a) to the facts of the case. *C.W.H.*, 538 S.W.3d at 496 (citing *Armbrister*, 414 S.W.3d at 697-98). Whether a material change of circumstance has occurred is a question of fact. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007).

Mother filed an appendix with her appellate brief that contains documents that are not in the appellate record. "It is well-settled in the law of appellate practice that attachments to briefs as evidentiary material are not part of the appellate record and cannot be considered by the Court." *Kries v. Kries*, No. E2004-00132-COA-R3-CV, 2004 WL 2709207, at *2 (Tenn. Ct. App. Nov. 29, 2004); *see also Watson v. Ralston-Good*, No. E2016-01505-COA-R3-CV, 2017 WL 2333076, at *4 (Tenn. Ct. App. May 30, 2017) ("[W]e cannot consider the exhibits to or the facts included in [the plaintiff's] principal and reply briefs that are not supported by the record before us."). Thus, we cannot consider any evidence Mother relies on in support of her argument that was not presented to the juvenile court and is outside the appellate record. *See Richmond v. Richmond*, 690 S.W.2d 534, 535 (Tenn. Ct. App. 1985) ("This is a court of errors and appeals in which matters below are reviewed when presented by a duly authenticated record brought to this court

pursuant to the Tennessee Rules of Appellate Procedure."); TENN. R. APP. P. 24(g) ("Nothing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court . . . .").

The material change of circumstance Mother asserted in her petition to change the primary residential parent from Father to herself was that Father was interfering with Mother's attempts to rebuild her relationship with Child. On appeal, Mother argues that the trial court erred by failing to so find and failing to designate her as Child's primary residential parent. The record shows that a year-long restraining order against Mother was in effect starting on June 15, 2015, which prevented Mother from having any contact with Father or Child. Once that order expired, the record does not show that Father interfered with Mother's supervised visitation until he learned that Mother had gone to Child's school to eat lunch with Child in August 2016, which was a violation of the juvenile court's order. On September 1, 2016, the juvenile court issued a temporary restraining order prohibiting Mother from visiting with Child at school or removing Child from school. The juvenile court stated that Mother was not permitted to have unsupervised visitation with Child until the agency that was supervising her visitation specifically indicated that Mother was ready to begin unsupervised visits. The record does not reflect that this specific indication was ever provided to the court.

The juvenile court prepared a statement of the evidence after rejecting the statement Mother presented. The court's statement of the evidence is 336 pages long, and the court wrote that its statement is "as accurate a representation as reasonably possible of the substance of the statements offered to the Court over the course of 140+ total hours over 30 days dedicated to this matter in Juvenile Court." According to the court's statement of the evidence, Father testified that once the restraining order preventing Mother from seeing Child expired and Mother began supervised visitation with Child, Child's behavior deteriorated and Child began kicking and hitting other children at the daycare center. Father testified that Child's behavior at school suffered as well. Two days after Mother went to Child's school to eat lunch with Child, Child stomped on and broke a toe of Child's teacher. Child was disruptive in the classroom and would run out for no apparent reason. Father testified that he received "constant calls from the school to pick [Child] up. On some days [Child] would get suspended and on some days I just picked [Child] up." Child's behavior at his house also suffered. Once Child began having contact with Mother after the order of protection expired, Father testified that Child started kicking and biting Father when Child became upset. When asked what Father wanted the court to do as far as parenting time for Mother, Father responded:

> I want [Mother] to have supervised visitation stopped until [she] gets the help she needs and presents her case to Court that she is fit and not going to harm [Child] emotionally. I will be more than happy to come to some kind of

visitation, any type of relationship. I wish [Child] can have a relationship with [Mother]. It is sad that she cannot do.

Judy Mullins, who supervised some of Mother's visitations, testified that Mother told Child Father was "a liar" during one of the supervised visits and that Mother had "inappropriate conversations" with Child during three out of the eight visits she supervised. In her therapeutic observation notes, Ms. Mullins wrote that Mother needed to develop more consistent parenting skills and that she needed help developing appropriate boundaries with Child.

Latarra Ballard provided supervised visitation services to Mother and Child beginning in December 2017. Ms. Ballard wanted to supervise a visit at Mother's home, but Mother refused to allow Ms. Ballard to enter her home. Ms. Ballard testified that she believed in-home services should be in place before Mother started unsupervised visitation. She said that Child played one parent off the other, and it was necessary for a neutral party to observe Child in both homes to understand the dynamics of Child's interaction with each parent in the different environments.

Dr. Berryman was Child's individual therapist for out-patient therapy, and she testified that there must be a period of consistent positive supervised visits before unsupervised visits can occur. During cross-examination, Mother's attorney asked Dr. Berryman to explain how Mother's supervised visitations were not going smoothly. Dr. Berryman testified that Mother raised topics with Child that Dr. Berryman had asked Mother to avoid and said "the easiest way to put it was just [Mother's] constant arguing and refusal to listen and follow the rules."

Our review of the record and statement of the evidence reveals that Father has not interfered with Mother's parenting time, as Mother contends. Rather, Father sought help from the juvenile and circuit courts when he observed problems with Child's behavior at school or at home that he believed stemmed from Child's interactions with Mother (either in-person or telephonic). The circuit court and juvenile court imposed limitations on Mother's contact with Child, not Father. Mother challenges the juvenile court's findings of fact set forth in the final order entered on April 19, 2018. However, the facts in that order are supported by the statement of the evidence and exhibits introduced at the trial. Mother has failed to show that the evidence preponderates against the juvenile court's factual finding that Mother failed to establish a material change of circumstance to justify considering whether the designation of Child's primary residential parent should be altered. Because Mother did not make the requisite showing of a material change of circumstance, the juvenile court was not required to undertake a best interest analysis and consider the factors set forth in Tenn. Code Ann. § 36-6-106(a).[3]

_____

[3]In her petition, Mother sought only to modify the parenting plan to change the primary residential parent from Father to herself; she did not seek to modify the parenting plan to obtain more residential parenting

- 16 -

C. Statutory Requirement to Maximize Parenting Time

Mother next contends that the trial court erred by failing to maximize her parenting time as required by Tenn. Code Ann. § 36-6-106(a). The section of the statute that Mother relies on provides as follows:

> In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.

Mother also claims a constitutional right to associate with Child. Unlike a parental termination case, Mother's parental rights to Child have not been terminated. *See* Tenn. Code Ann. § 36-1-113.

As the procedural history of this case shows, Mother and Father shared essentially equal parenting time until Child was five years old and Father petitioned to be named Child's primary residential parent. Each time a court has reduced Mother's parenting time (or enjoined her from being around Child at all), the reduction (or enjoinment) has been in response to conduct by Mother that a court has found to be detrimental to Child's mental and emotional health, welfare, and stability. In the April 19, 2018 order that Mother is appealing, the juvenile court gave Mother the opportunity to have unsupervised visitation (1) after a third party visited her home to determine whether it is a safe environment for Child and (2) upon the start-up of in-home services. Mother, however, refused to allow either of these events to occur.

Less than two weeks after the juvenile court issued its decision, DCS filed a petition for a restraining order against Mother based on its concerns about Mother's "mental stability due to her erratic behavior" and stating it was concerned that Child "would be at risk of harm if allowed to have unsupervised visitation with the mother." After allowing Mother telephonic visitation and supervised therapeutic visitation, the juvenile court suspended all contact between Mother and Child based on evidence that Mother was refusing to comply with the court's orders regarding appropriate topics of conversation and conduct during the visits.

---

time with Child. Father sought to alter the parenting schedule in his petition, but he did not appeal the trial court's judgment. As a result, we need not address the court's finding that "there has been no material change of circumstances for purposes of modification of a parenting plan."

- 17 -

The latest court order in the appellate record reflects that Mother will be able to resume visitation with Child once she completes a full psychological examination and parenting assessment. She will be permitted to have Child visit in Mother's home once she allows DCS, the guardian ad litem, Youth Villages, and any other provider agencies to visit her home to assess its suitability. Mother has failed to show that these conditions are not in Child's best interest or that the juvenile court has unlawfully infringed on any of her constitutional rights. As our Supreme Court has stated, a child's welfare is of "'paramount'" importance when reviewing parenting visitation schedules, with the result that "the noncustodial parent's visitation 'may be limited, or eliminated, if there is definite evidence that to permit . . . the right would jeopardize the child, in either a physical or moral sense.'" *Eldridge*, 42 S.W.3d at 85 (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)).

## III. CONCLUSION

The juvenile court's judgment is affirmed. Costs of this appeal shall be taxed to the appellant, Lydia Ann Hubbell, for which execution shall issue if necessary.

_____
ANDY D. BENNETT, JUDGE